UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JOI D. HYATTE<br>7213 Walker Mill Road<br>Capitol Heights, MD 20743,<br><br>Plaintiff,<br><br>vs.<br><br>MICHAEL B. MUKASEY, in his official capacity as<br>Attorney General of the United States<br>United States Department of Justice<br>950 Pennsylvania Avenue, NW<br>Washington, DC 20530-0001<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. _____<br><br>JURY TRIAL DEMANDED |

## **COMPLAINT**

1.    Plaintiff Joi D. Hyatte, an African-American woman employed by the United States

Department of Justice ("DOJ") in the Voting Section of the Civil Rights Division, brings

this action against Michael B. Mukasey, Attorney General of the United States and the

head of DOJ, to vindicate her right under Title VII of the Civil Rights Act of 1964, as

amended ("Title VII"), 42 U.S.C. § 2000e *et seq.*, to be free from racial discrimination in

employment.  Because of her race, Ms. Hyatte was repeatedly denied the opportunity to

apply and compete for positions as a Civil Rights Analyst ("CRA") or Paralegal

Specialist in the Voting Section.  DOJ recruited Caucasian and Latino candidates from

outside the government to prevent Ms. Hyatte and her African-American colleagues from

applying and competing for vacant positions.  DOJ also created a hostile work

environment based on race by engaging in, fostering, and condoning racially hostile

conduct against African-Americans.  Former Voting Section Chief John Tanner,

Caucasian, and former Acting Deputy Section Chief Yvette Rivera, Latina, subjected Ms.

Hyatte and her African-American colleagues to numerous forms of discrimination and

harassment.

2.    Ms. Hyatte seeks a declaratory judgment that she was unlawfully discriminated against.

She also seeks back pay, lost benefits, compensatory damages, and an injunction ordering

that she be promoted to a GS-12 CRA position at the next available vacancy in the

Section 5 unit of the Voting Section at DOJ, pursuant to 42 U.S.C. §§ 1981a(a)(1),

2000e-5(g), 2000e-16(d).

## JURISDICTION

3.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 42 U.S.C §§

2000e-5(f)(3), 2000e-16(d).

## PARTIES

4.    Plaintiff Joi D. Hyatte is an African-American woman currently employed by DOJ in the

Voting Section of the Civil Rights Division ("Voting Section").  Ms. Hyatte is a United

States citizen.  She has worked for DOJ in the District of Columbia since February 1995.

Ms. Hyatte began her career in the Voting Section of DOJ as a Secretary at GS-5, step 1,

and was subsequently promoted to GS-7.  In August 1999, Ms. Hyatte was promoted to

an Equal Opportunity Assistant at GS-8.  Her current pay grade is GS-9, step 6.  She has

not received a promotion since 1999.  Ms. Hyatte earned a Paralegal Degree from Prince

George's Community College in May 1997, graduating with high honors.

5.    Defendant Michael B. Mukasey is the Attorney General of the United States and the head

of DOJ.

## FACTS

6.     The DOJ Civil Rights Division is responsible for enforcing federal statutes prohibiting

discrimination on the basis of race, color, sex, disability, religion, and national origin.

The Voting Section oversees enforcement of the Voting Rights Act of 1965 ("the Voting

Rights Act" or "the Act"), which precludes a covered state or subdivision from imposing

a "voting qualification or prerequisite to voting or standard, practice or procedure . . . in a

manner which results in a denial or abridgement of the right of any citizen of the United

States to vote on account of race or color," 42 U.S.C. § 1973(a), or "because he is a

member of a language minority group."  § 1973b(f)(1).

7.     The Voting Rights Act provides that whenever a covered state or subdivision makes a

change to its voting laws that might deny or abridge "the right to vote on account of race

or color, or [membership in a language minority group]," the state or subdivision must

either submit the proposed change to the Attorney General for review and approval, or

seek a declaratory judgment in federal court that the change complies with the Act.

§ 1973c(a).

8.     Within the Voting Section, the proposed changes submitted to the Attorney General are

known as "Section 5 submissions."

9.     The "Section 5" unit of the Voting Section reviews Section 5 submissions.

10.    John Tanner was Voting Section Chief and Ms. Hyatte's highest-ranking supervisor

within the Voting Section from June 2005 to December 2007.

11.    Yvette Rivera joined the Voting Section as Special Counsel in the Litigation unit on

October 30, 2005.  Through appointment by Mr. Tanner, Ms. Rivera became Acting

Deputy Section Chief in charge of the Section 5 unit in February 2006.  From February

2006 through January 11, 2008, Ms. Rivera made assignments of Section 5 submissions to Voting Section staff.  Ms. Rivera was Ms. Hyatte's immediate supervisor from July 4, 2006 until January 11, 2008.

12.    Mr. Tanner resigned as Voting Section Chief in December 2007.

13.    Ms. Rivera was removed from the Section 5 unit on January 11, 2008.

<u>Failure to Promote</u>

14.    CRAs and Paralegal Specialists assist Voting Section attorneys in analyzing Section 5 submissions.  Both CRAs and Paralegal Specialists in the Section 5 unit are referred to by employees in the unit as analysts.

15.    Generally, analysts with GS level 7, 9, or 11 are Line Analysts; GS-12 analysts are Senior Analysts; GS-13 analysts are Team Leaders; and GS-14 analysts are Supervisory Analysts.

16.    Past DOJ job announcements indicate that eligibility for an analyst position requires United States citizenship and at least one year of specialized experience.

17.    Ms. Hyatte met with Ms. Rivera the week of May 15, 2006 and expressed her interest in a promotion to a position as an analyst.  After this meeting, Ms. Hyatte separately informed Mr. Tanner of her interest in these positions.

18.    Repeatedly thereafter, Ms. Hyatte reaffirmed to Mr. Tanner and Ms. Rivera that she was interested in applying and competing for these positions.

19.    For example, on September 12, 2006, Ms. Hyatte reminded Ms. Rivera that she was still interested in and qualified for an analyst position.

20.    Ms. Hyatte again e-mailed Mr. Tanner and Ms. Rivera on January 11, 2007, to remind them that she was "still very much interested in being considered for [analyst] positions

in the future[,]" and to request their "assistance or advice . . . regarding any further steps I should take to be considered for an Analyst position or Paralegal position in the Section."

21.    Neither Mr. Tanner nor Ms. Rivera followed up with Ms. Hyatte regarding her January 11, 2007 inquiry, other than to acknowledge receipt of her e-mail.

22.    To enhance her qualifications for a position as an analyst, Ms. Hyatte attended a DOJ internal training program on Section 5 analysis, in or around February 2003.  Ms. Hyatte has since attended other relevant training sessions, including the Voting Section's paralegal training on February 27, 2007.

23.    Shortly after completing Section 5 training in 2003, Ms. Hyatte analyzed her first Section 5 submission.

24.    To date, Ms. Hyatte has analyzed over 400 Section 5 submissions in addition to performing her duties as an Equal Opportunity Assistant.

25.    Upon information and belief, no other non-analyst within the Section 5 unit has analyzed more Section 5 submissions than Ms. Hyatte.

26.    Ms. Hyatte received positive feedback on her Section 5 analyst work, in formal performance evaluations and in informal comments, at all times relevant to this complaint.

27.    For example, Supervisory CRA Natalie Govan, then Ms. Hyatte's immediate supervisor, noted in June 2006, "Ms. Hyatte has analyzed a significant # of Section 5 submissions and processed them with a high degree of thoroughness and quality."

28.    In Ms. Hyatte's 2006-2007 employee evaluation, Ms. Rivera observed, "attorney reviewers praised Ms. Hyatte for knowing when to ask questions, for keeping them

appraised of the status of submissions, and for a job well done on the [sic] preparing the factual analyses."

29. During Ms. Hyatte's mid-year employee evaluation on February 26, 2007, Ms. Rivera asked Ms. Hyatte to assist the Section 5 unit by continuing to analyze Section 5 submissions.  Ms. Hyatte subsequently processed additional Section 5 submissions for the section.

30. Ms. Hyatte assumed Section 5 analyst duties without any corresponding change in job title or salary increase.

31. Throughout her tenure in the Voting Section, Ms. Hyatte has received exceptionally positive reviews regarding her performance as an Equal Opportunity Assistant.

32. Ms. Hyatte received an overall rating of "Outstanding" on her two most recent performance evaluations.  She was also rated "Outstanding" or "Excellent" in each of the individual categories on these evaluations.

33. DOJ's policy is to hire new analysts in the Voting Section primarily through competitive advertising and hiring.  This process provides current employees with notice of open positions and an opportunity to apply and compete for them.  This was DOJ's practice before Mr. Tanner and Ms. Rivera's tenure as Voting Section managers.

34. During Mr. Tanner's and Ms. Rivera's tenures, DOJ disregarded this policy by repeatedly using special hiring authority programs to circumvent its regular hiring procedures and to avoid giving African-American employees in the Voting Section an opportunity to apply and compete for analyst positions.

35. As part of these practices, DOJ actively recruited and hired only Caucasian and Latino candidates from outside the government for analyst positions in Section 5, despite the

availability of qualified and trained African-American employees, like Ms. Hyatte, who had repeatedly expressed interest in the positions.

36. Between July 24, 2006 and March 20, 2007, three Caucasians and two Latinos were hired into the Voting Section as Paralegal Specialists. None of these newly hired analysts had previously worked for the federal government.

37. DOJ hired these individuals without advertising the openings to current government employees, including Ms. Hyatte, or giving current employees an opportunity to apply and compete for the open positions.

38. Ms. Hyatte learned of these Paralegal Specialist "openings" only after each newly hired analyst began working in the Section 5 unit.

39. For example, one of the new analysts, a Caucasian female, joined the Section 5 unit on February 6, 2007. Upon information and belief, DOJ actively recruited this individual under the auspices of a special hiring authority program.

40. The new analyst was never previously employed by the federal government and lacked prior experience analyzing Section 5 submissions.

41. The new analyst had previously applied for a paralegal position in a different DOJ division but had been rejected.

42. The new analyst did not apply for or express interest in a Paralegal Specialist position in the Section 5 unit at any time before DOJ actively recruited her.

43. Ms. Hyatte was qualified for the Paralegal Specialist position, and had expressed interest in it, at the time DOJ contacted the new analyst.

44. DOJ did not advertise this Paralegal Specialist position to current government employees, including Ms. Hyatte, or give them an opportunity to apply for it.

45.    Ms. Hyatte first learned of the "opening" when she received a February 6, 2007 email announcing that the new analyst had joined the Voting Section.

Hostile Work Environment

46.    Throughout their tenures as Voting Section managers and Ms. Hyatte's supervisors, Mr. Tanner and Ms. Rivera displayed racial animus towards African-American employees and fostered a work atmosphere in which employees reasonably believed that management decisions were made on the basis of race.

47.    During his tenure at DOJ, Mr. Tanner demonstrated hostility towards African-American employees.

48.    For example, on multiple occasions as Voting Section Chief, Mr. Tanner wore a tie featuring cotton balls, evoking slave-era cotton plantations in the workplace.

49.    In summer 2007, union representatives asked Mr. Tanner to stop wearing the tie at work because of the racially hostile environment it created.  Mr. Tanner refused.

50.    Mr. Tanner failed to take adequate corrective action when his staff behaved in a racially and sexually offensive manner.

51.    For instance, on February 12, 2007, three male Caucasian attorneys within the Voting Section, all hired by Mr. Tanner, made racially and sexually derogatory remarks about two female analysts, one Caucasian and one African-American, within the Voting Section.  The attorneys mocked the Caucasian analyst for displaying pictures of prominent African-American civil rights activists and leaders on the walls of her office. They also commented that she had a "tight ass," and referred to both women as "lesbians" and "carpet munchers."

52.     Upon information and belief, despite complaints from his staff, Mr. Tanner did not discipline these attorneys for their comments.

53.     Mr. Tanner's failure to discipline these attorneys concerned Ms. Hyatte.  She feared she could be assigned to work with one or more of them and be subjected to further harassment.

54.     Mr. Tanner publicly expressed his racial hostility towards African-Americans and other racial minorities by making offensive, stereotypical comments in public forums.

55.     For example, in an October 2007 address to the Georgia State Conference of the National Association for the Advancement of Colored People ("NAACP"), Tanner made light of police harassment of African-Americans.  Tanner suggested that Georgia's proposed voter identification law disproportionately impacted whites, who are not used to carrying identification because they do not live with fear of such harassment.  Tanner said, "You think you get asked for ID more than I do? . . . I've never heard anyone talk about driving while white."

56.     Later that week, in an address before the National Latino Congreso, Mr. Tanner downplayed the voter identification law's significance for elderly minority voters, declaring, "Minorities don't become elderly the way white people do: They die first."

57.     Mr. Tanner's offensive comments about African-Americans and other racial minorities caused a public outcry.  Voting rights groups and members of Congress publicly criticized Mr. Tanner and demanded his resignation.

58.     Mr. Tanner's racially offensive comments were widely publicized and known among Voting Section staff.

59.   During Ms. Rivera's tenure as Acting Deputy Section Chief in the Section 5 unit ("Ms. Rivera's tenure"), Ms. Rivera expressed racial animosity towards African-Americans, and fostered a hostile work environment for African-American employees including Ms. Hyatte.

60.   During Ms. Rivera's tenure, Ms. Rivera questioned the competence of African-American employees and monitored their work much more closely than that of Caucasian and Latino staff.

61.   Ms. Rivera directed inexperienced Caucasian and Latino employees to monitor the work of more senior African-American employees.

62.   For example, in 2006, Ms. Rivera ordered a newly-hired Latino analyst to validate the Section 5 submission analysis of an African-American employee who had over twenty-five years more experience with Section 5 submissions.  At the time of the request, the African-American employee, Supervisory Analyst Natalie Govan, was the most senior analyst in the Section 5 unit.

63.   Upon information and belief, during her tenure, Ms. Rivera routinely delegated desirable assignments to inexperienced Caucasian and Latino analysts more than to experienced African-American analysts.

64.   Working on challenging and complex Section 5 work assignments provides valuable experience that bolsters Section 5 analysts' qualifications for promotions and increases the likelihood that they will receive performance awards.

65.   Performance awards may include cash bonuses, and receipt of performance awards is one of the evaluation and ranking criteria for competitively advertised positions in the federal government.

66.   Upon information and belief, during Ms. Rivera's tenure, she disproportionately denied African-Americans formal recognition for Section 5 performance awards, including cash bonuses.  Ms. Rivera preferentially distributed such awards to Caucasian and Latino staff.

67.   For example, Ms. Rivera gave performance awards to each of the Caucasian and Latino analysts in the Section 5 unit in October 2007.  However, she did not give any performance awards to the African-Americans analysts in the Section 5 unit at that time.

68.   During Ms. Rivera's tenure, Ms. Rivera maintained a practice of downgrading African-American employees' formal evaluations based solely on their race, including Ms. Hyatte's.

69.   Ms. Rivera also instructed Section 5 supervisors reporting to her to downgrade the performance evaluations of African-American employees.

70.   Supervisory Analyst Natalie Govan took early retirement on July 3, 2006 rather than carry out Ms. Rivera's order to downgrade the performance evaluations of several African-American employees whom Ms. Govan had rated as "outstanding."

71.   Ms. Govan had been Ms. Hyatte's immediate supervisor for the entire 2005-2006 review cycle, which covered April 1, 2005 to March 31, 2006.

72.   Despite the fact that Ms. Rivera had not directly supervised Ms. Hyatte during any portion of the 2005-2006 review cycle, Ms. Rivera altered Ms. Hyatte's 2005-2006 evaluation so that it was less positive.

73.   DOJ discouraged African-Americans from applying for promotions in the Voting Section while encouraging Caucasian, Asian, and Latino applicants from inside and outside the section to apply for positions.

74.     Prior to July 2006, Supervisory Analysts were filled only at the GS-14 level. To have been eligible for a GS-14 position, an applicant within the Section 5 unit would have been required to hold at least a GS-13 position at the time of the application.

75.     The only GS-13 analysts within the Section 5 unit in July 2006 were African-American.

76.     There was a Caucasian analyst in the Section 5 unit at the time, but she held a GS-12 position.

77.     In July 2006, DOJ announced a vacancy for a GS-13/14 Supervisory Analyst within the Section 5 unit. Because DOJ changed the Supervisory Analyst position to a GS-13/14, GS-12 analysts, including the Caucasian analyst, were eligible to apply.

78.     Upon information and belief, DOJ changed the Supervisory Analyst position to a GS-13/14 in July 2006 so the Caucasian analyst would be eligible to apply.

79.     Ms. Rivera pressured the Caucasian GS-12 employee to apply for the position. The Caucasian employee declined. Ms. Rivera told the employee that Mr. Tanner would be disappointed.

80.     One of the primary reasons the Caucasian employee declined to apply for the Supervisory Analyst position was that she anticipated that, if she occupied the position, Ms. Rivera would pressure her to downgrade the evaluations of African-American employees.

81.     Ms. Rivera made clear to all of the Voting Section employees that she did not trust African-American employees to act honestly and diligently.

82.     Time off with pay, granted in exchange for overtime work, is known as compensatory time. During Ms. Rivera's tenure, Ms. Rivera granted compensatory time requests of Caucasians and Latinos without questioning their motives but did not exhibit the same trust towards African-American employees.

83.    In an e-mail on April 24, 2007, Caucasian analyst Karen Love noted, "[Ms. Rivera] never

. . . asked me to justify leave to her.  Ms. Rivera always graciously approves my requests

to leave early or work late comp[ensatory] time."

84.    In contrast, Ms. Rivera consistently denied or demanded much more detailed

explanations before granting compensatory time requests by African-American

employees, including Ms Hyatte.

85.    For example, on September 11, 2006, Ms. Rivera interrupted a meeting between Ms.

Hyatte and one of Ms. Hyatte's subordinates and demanded an explanation for why Ms.

Hyatte had requested to leave work thirty minutes early that afternoon, thereby

humiliating Ms. Hyatte in front of the subordinate.

86.    Ms. Rivera's distrust of African-Americans also influenced how she treated them if they

arrived at work late.  She admonished African-Americans, including Ms. Hyatte, but not

Caucasian or Latino employees who were tardy.

87.    Ms. Rivera singled out Ms. Hyatte for unsubstantiated accusations because of personal

animus based on race.

88.    For example, on September 12, 2006, Ms. Rivera summoned Ms. Hyatte into a closed-

door meeting and accused Ms. Hyatte of engaging in "inappropriate behavior," without

identifying any particular behavior or explaining how it was inappropriate.

89.    Ms. Hyatte was unable to determine how Ms. Rivera wanted her to behave because Ms.

Rivera refused to specify the conduct she found "inappropriate."

90.    Ms. Rivera subsequently threatened Ms. Hyatte with formal reprimand if Ms. Hyatte's

alleged "inappropriate behavior" continued.

91.   Ms. Hyatte understood this threat to mean that Ms. Rivera would deny Ms. Hyatte promotional opportunities and formal recognition for performance awards.

92.   Ms. Hyatte did not receive any performance awards after her September 12, 2006 meeting with Rivera until after she filed her formal discrimination complaint with the DOJ Equal Employment Opportunity (EEO) Office.

93.   Ms. Rivera employed threatening tactics to mislead Ms. Hyatte and undermine Ms. Hyatte's ability to carry out her job.

94.   Ms. Rivera threatened to strip Ms. Hyatte and her African-American supervisor Natalie Govan of their supervisory responsibilities.

95.   In April 2006, Ms. Rivera told Ms. Hyatte that she would be removed as supervisor of Section 5 unit secretaries.

96.   Ms. Rivera also ordered Ms. Hyatte to report directly to her instead of reporting to Natalie Govan, the Supervisory Analyst for Section 5.

97.   Ms. Rivera informed Ms. Hyatte that she would serve as Ms. Rivera's personal assistant.

98.   On April 10, 2006, Ms. Hyatte inquired with Ms. Rivera concerning the status of the changes in the delegation of authority and chain of command.  Ms. Rivera responded that she "misspoke" earlier and informed Ms. Hyatte that the supervisory responsibilities and reporting relationships would remain unchanged.

99.   Ms. Rivera expressed hostility towards African-Americans, including Ms. Hyatte, by making demeaning comments on multiple occasions.

100.   While Ms. Rivera was Ms. Hyatte's supervisor, she told Ms. Hyatte that Ms. Hyatte was "very clean," implying that Ms. Rivera believed African-Americans typically had poor hygiene or were dirty people.

101.   Tenika Fontanelle was an African-American employee supervised by Ms. Hyatte from 2005 to 2006.

102.   Ms. Fontanelle informed Ms. Hyatte as her supervisor that Ms. Rivera had targeted her for harassment.

103.   Ms. Fontanelle explained that Ms. Rivera frequently checked up on Ms. Fontanelle to see if she was at her desk, made offensive comments on Ms. Fontanelle's personal life, and created a work environment in which Ms. Fontanelle was uncomfortable and anxious.

104.   For example, in 2006, Ms. Rivera called Ms. Fontanelle into her office and advised Ms. Fontanelle that she should invest in her child's education instead of spending all her money on clothes, and that she should not allow her child to watch TV all day.

105.   Ms. Fontanelle understood Ms. Rivera to be implying that she and other African-Americans were unfit and inattentive parents.

106.   Ms. Rivera's harassment of Ms. Fontanelle interfered with Ms. Hyatte's supervisory responsibilities and added to the racially hostile environment Ms. Hyatte experienced.

107.   Union officials Wonder Moore-Davis and Barbara Lott met with Mr. Tanner, Ms. Rivera, and representatives from the DOJ Human Resources Department in October 2006 and February 2007 to discuss employee complaints regarding Ms. Rivera's mismanagement of the Section 5 unit, including her harassment and disparate treatment of African-American staff.

108.   Voting Section employees continued to lodge racial discrimination complaints with the union against Ms. Rivera after the October 2006 and February 2007 meetings.

109.   Ms. Moore-Davis and Ms. Lott held a mediation meeting with DOJ Human Resources representative Camilia Hering and DOJ Employment Litigation attorney Diana Embrey on April 25, 2007.

110.   At this meeting, several Section 5 employees, including Ms. Hyatte, attended and voiced their concerns about Ms. Rivera's racially discriminatory practices.  Ms. Moore-Davis and Ms. Lott informed Ms. Hering and Ms. Embrey that employee complaints of harassment and disparate treatment of African-American staff had continued after the October 2006 and February 2007 meetings between union representatives and Mr. Tanner, Ms. Rivera, and DOJ's Human Resources representatives.

111.   In addition to Ms. Hyatte, other African-American employees within the Voting Section have brought employment discrimination complaints against DOJ, or threatened to do so, for similar racial discrimination and harassment by Mr. Tanner and Ms. Rivera.

112.   For example, African-American employee Angela Parks filed a formal EEO complaint against DOJ on March 1, 2007, alleging discrimination based on race.  In a July 19, 2007 settlement between the parties, Ms. Parks agreed to dismiss her complaint in exchange for a transfer from the Voting Section to the Criminal Division, where she would not have to interact with Mr. Tanner or Ms. Rivera on a regular basis.

113.   During Mr. Tanner and Ms. Rivera's tenure as Voting Section managers, multiple employees complained to DOJ and union representatives of discriminatory hiring practices and hostile working conditions in the Voting Section as a result of Mr. Tanner and Ms. Rivera's conduct.  Notwithstanding these complaints, DOJ failed to investigate the allegations or take remedial action.

<u>Ms. Hyatte's EEO Complaint and DOJ's Response</u>

114.    Ms. Hyatte filed an informal employment discrimination complaint with the DOJ EEO

Office on February 12, 2007, asserting that she was denied the opportunity to compete for

a promotion and subjected to a hostile working environment because of her race.

115.    After the informal EEO process failed to resolve the problem, Ms. Hyatte filed a formal

employment discrimination complaint with the DOJ EEO Office on April 30, 2007.  Ms.

Hyatte alleged in her formal complaint that DOJ unlawfully denied her opportunities for

promotion and subjected her to a hostile work environment because of her race.

116.    During Mr. Tanner's and Ms. Rivera's tenures as Voting Section managers, before Ms.

Hyatte filed her formal discrimination complaint, DOJ did not hire a single African-

American analyst in the Section 5 unit.  During this same period, DOJ did not hire any

African-Americans as analysts in the entire Voting Section, but did hire four Caucasians,

two Latinos, and two Asians as analysts in the Voting Section.

117.    In August 2007, after Ms. Hyatte had filed her employment discrimination complaint

with the DOJ EEO Office, DOJ competitively advertised four Section 5 analyst positions

at GS levels 9 and 11.

118.    Two of these positions were advertised as "status," indicating that they were available

only to current and certain former government employees.  The other two positions were

advertised as "non-status," indicating that they were available to candidates outside the

government as well as to current and certain former government employees.

119.    Ms. Hyatte applied for all four positions.

120.    Ms. Hyatte was fully qualified and satisfied the eligibility requirements for all four

positions.

121.   Upon information and belief, DOJ, in violation of its policy, denied Ms. Hyatte the opportunity to compete for the two "status" positions.  DOJ considered Ms. Hyatte only for the two "non-status" analyst positions.

122.   As a result, Ms. Hyatte was forced to compete against candidates from outside the government for the two "non-status" positions, and did not have the opportunity to compete against only current and certain former government employees for the "status" positions.

123.   Upon information and belief, if DOJ had filled the analyst positions on the terms of their advertisements, Ms. Hyatte would have been the highest ranked candidate considered for the two "status" positions.

124.   DOJ determined that Ms. Hyatte was qualified for the "non-status" positions and selected her for an interview.

125.   Ms. Hyatte was interviewed in November 2007 by a panel that included Ms. Rivera.

126.   During the interview, Ms. Rivera questioned Ms. Hyatte about her relationship with Voting Section management.  Ms. Rivera also questioned Ms. Hyatte's truthfulness when Ms. Hyatte discussed her experience analyzing Section 5 submissions, thereby humiliating Ms. Hyatte in front of the interview panel.

127.   Ms. Hyatte was one of four candidates initially deemed qualified and interviewed for the four analyst positions.  Ms. Hyatte was the only government employee among the four candidates and the only one of the four who was not selected for the position.

128.   After interviewing Ms. Hyatte, DOJ continued to consider and interview "non-status" candidates from outside the government.

129.    DOJ ultimately hired five analysts for the Section 5 unit, all of whom were "non-status" applicants from outside the government.

130.    DOJ did not select Ms. Hyatte for any of the analyst positions despite her qualifications and despite its own advertisement that two of the analyst positions would be available to "status" candidates only.

131.    On June 14, 2007, DOJ's EEO Office initiated investigation into Ms. Hyatte's employment discrimination claims.  Over 180 days have elapsed since Ms. Hyatte filed her formal EEO complaint against DOJ.  42 U.S.C. § 2000e-16(c).  To date, DOJ's EEO Office has not taken final action on Ms. Hyatte's complaint.

<u>Ms. Hyatte's Injuries</u>

132.    A promotion to a GS-11 analyst position would have increased Ms. Hyatte's salary and made her eligible for subsequent advancement to a GS-12 analyst position, which would have further increased her salary.

133.    DOJ's failure to promote Ms. Hyatte because of her race caused her financial injury.

134.    The strain caused by the indignity of being denied the opportunity to apply, compete, and be considered for a promotion because of her race caused Ms. Hyatte emotional and mental suffering, including intense anxiety and sleeplessness.

135.    The racially hostile work environment at DOJ also contributed significantly to Ms. Hyatte's emotional and mental suffering, which included, but was not limited to, anxiety, embarrassment, humiliation, despair, anger and loss of faith in her employer.

136.    Ms. Hyatte was diagnosed with high blood pressure in 2006 and diabetes in 2007.   These conditions were caused partially by work-related stress.  Ms. Hyatte has been required to take regular medication, including self-administered injections, to treat these conditions.

## FIRST CAUSE OF ACTION

137.   Failure by a federal agency to consider an employee for a promotion because of her race

is a "personnel action" amounting to unlawful "discrimination based on race" under Title

VII.  42 U.S.C. § 2000e-16(a).

138.   Ms. Hyatte is and has been highly qualified for a CRA or Paralegal Specialist position,

and she repeatedly expressed this interest to her DOJ supervisors.  DOJ repeatedly failed

to consider Ms. Hyatte for a CRA or Paralegal Specialist position, denied her the

opportunity to apply and compete for vacant positions, and denied her promotions to

positions to which she had applied, because of her race.

139.   DOJ's conduct constituted unlawful discrimination in violation of Title VII.  This

discrimination began on July 24, 2006, the date DOJ first filled a CRA or Paralegal

Specialist position in the Voting Section for which Ms. Hyatte was qualified without

competitively advertising the position, and continued thereafter.

## SECOND CAUSE OF ACTION.

140.   Subjecting an employee to a hostile work environment because of her race amounts to

"discrimination based on race" in violation of Title VII.

141.   Beginning in June 2006, DOJ subjected Ms. Hyatte to a hostile work environment

because of her race in violation of Title VII.  This hostile work environment included

racially derogatory remarks, personal attacks, excessive scrutiny, intentional humiliation,

threats, and disparate treatment in numerous contexts based on race.  DOJ engaged in,

fostered, and condoned racially offensive behavior and widespread inequitable practices

against African-American employees within the Voting Section.

## CLAIM FOR RELIEF

WHEREFORE, Ms. Hyatte respectfully requests that this Court issue an order:

A.  Declaring that DOJ unlawfully discriminated against Ms. Hyatte because of her race;

B.  Awarding back pay including, but not limited to, lost wages, benefits, bonuses, and interest on such amounts dating from July 24, 2006 to the date judgment is entered in this case, in an amount to be determined, pursuant to 42 U.S.C. §§ 2000e-5(g), 2000e-16(d);

C.  Awarding compensatory damages for financial losses, and for emotional pain and suffering, inconvenience, and other non-pecuniary losses caused by the defendant's unlawful discrimination, in an amount to be determined but in no event less than $1,000,000, pursuant to 42 U.S.C. § 1981a(a)(1);

D.  Ordering DOJ to promote Ms. Hyatte to a GS-12 CRA position within the Section 5 unit of the Voting Section at the next available vacancy, pursuant to 42 U.S.C. §§ 2000e-5(g), 2000e-16(d);

E.  Awarding Ms. Hyatte costs and attorney's fees in this action, pursuant to 42 U.S.C. §§ 2000e-5(k), 2000e-16(d); and

F.  Granting such other and further relief as this Court may deem just and proper.

Respectfully Submitted,

Kathryn A. Sabbeth (D.C. Bar No. 979101)
David C. Vladeck (D.C. Bar No. 945063)
Institute for Public Representation
Georgetown University Law Center
600 New Jersey Avenue, Suite 312
Washington, DC 20001
Phone: (202) 662-9535
Fax: (202) 662-9634
Email: ks455@law.georgetown.edu

*Attorneys for the Plaintiff*

May 29, 2008

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury for all claims presented.

Respectfully Submitted,

Kathryn A. Sabbeth (D.C. Bar No. 979101)
David C. Vladeck (D.C. Bar No.  945063)
Institute for Public Representation
Georgetown University Law Center
600 New Jersey Avenue, Suite 312
Washington, DC 20001
Phone: (202) 662-9535
Fax: (202) 662-9634
Email: ks455@law.georgetown.edu

*Attorneys for the Plaintiff*

May 29, 2008

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| JOI D. HYATTE  8888 | MICHAEL B. MUKASEY, in his official capacity as Attorney General |

| (b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF   20743 (EXCEPT IN U.S. PLAINTIFF CASES) | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT   20530 (IN U.S. PLAINTIFF CASES ONLY) NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED |

| (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) Kathryn A. Sabbeth David C. Vladeck Institute for Public Representation Georgetown University Law Center 600 New Jersey Ave., NW, Suite 312 Washington, D.C. 20001 (202) 662-9535 | Case: 1:08-cv-00908 Assigned To : Kennedy, Henry H. Assign. Date : 5/29/2008 Description: Employ. Discrim.   JURY ACTION |

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

O  1 U.S. Government Plaintiff

O  3 Federal Question (U.S. Government Not a Party)

⊙  2 U.S. Government Defendant

O  4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | O 1 | O 1 | Incorporated or Principal Place of Business in This State | O 4 | O 4 |
| Citizen of Another State | O 2 | O 2 | Incorporated and Principal Place of Business in Another State | O 5 | O 5 |
| Citizen or Subject of a Foreign Country | O 3 | O 3 | Foreign Nation | O 6 | O 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

| O A. Antitrust | O B. Personal Injury/ Malpractice | O C. Administrative Agency Review | O D. Temporary Restraining Order/Preliminary Injunction |
|---|---|---|---|
| ☐ 410 Antitrust | ☐ 310 Airplane ☐ 315 Airplane Product Liability ☐ 320 Assault, Libel & Slander ☐ 330 Federal Employers Liability ☐ 340 Marine ☐ 345 Marine Product Liability ☐ 350 Motor Vehicle ☐ 355 Motor Vehicle Product Liability ☐ 360 Other Personal Injury ☐ 362 Medical Malpractice ☐ 365 Product Liability ☐ 368 Asbestos Product Liability | ☐ 151 Medicare Act  **Social Security:** ☐ 861 HIA ((1395ff) ☐ 862 Black Lung (923) ☐ 863 DIWC/DIWW (405(g) ☐ 864 SSID Title XVI ☐ 865 RSI (405(g)  **Other Statutes** ☐ 891 Agricultural Acts ☐ 892 Economic Stabilization Act ☐ 893 Environmental Matters ☐ 894 Energy Allocation Act ☐ 890 Other Statutory Actions (If Administrative Agency is Involved) | Any nature of suit from any category may be selected for this category of case assignment.  *(If Antitrust, then A governs)* |

| O E. General Civil (Other) | OR | O F. Pro Se General Civil |
|---|---|---|

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant)
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

②

| ○ G. Habeas Corpus/ 2255 | ✗ H. Employment Discrimination | ○ I. FOIA/PRIVACY ACT | ○ J. Student Loan |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☒ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ K. Labor/ERISA (non-employment) | ○ L. Other Civil Rights (non-employment) | ○ M. Contract | ○ N. Three-Judge Court |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

◉ 1 Original Proceeding   ○ 2 Removed from State Court   ○ 3 Remanded from Appellate Court   ○ 4 Reinstated or Reopened   ○ 5 Transferred from another district (specify)   ○ 6 Multi district Litigation   ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

42 U.S.C. § 2000e-16(a) - employment discrimination on the basis of race

| **VII. REQUESTED IN COMPLAINT** | ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | **DEMAND $** _____ JURY DEMAND: | Check YES only if demanded in complaint YES ☒ NO ☐ |
|---|---|---|---|

| **VIII. RELATED CASE(S) IF ANY** | (See instruction) | YES ☐   NO ☒ | If yes, please complete related case form. |
|---|---|---|---|

| DATE 5/ 29/08 | SIGNATURE OF ATTORNEY OF RECORD | _signature_ |
|---|---|---|

### INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

  I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

  III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

  IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

  VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

  VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.